FILED

OCT 03 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| Whitnie Jackson, individually and as Personal Representative of the Estate of Amir Rodgers, Deceased. Plaintiff, | Case No: 1:25-cv-01227-BMB **JUDGE BRIDGET MEEHAN BRENNAN** |
| v. Cleveland Clinic Foundation, d/b/a Marymount Hospital, Dr. Nathan Eikhoff Marymount John/Jane Doe Medical staff defendants | COMPLAINT FOR VIOLATIONS OF: EMTALA (42 U.S.C. § 1395dd), MEDICAL NEGLIGENCE, WRONGFUL DEATH, AND VIOLATION OF OHIO PATIENT RIGHTS |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**I. NATURE OF THE ACTION**

1.      My name is Whitnie Jackson, and I am bringing this civil action against Cleveland Clinic Marymount Hospital and its staff for the preventable death of my son on January 26, 2024. At 28 weeks pregnant, I presented to Marymount Hospital experiencing preterm labor with a footling breech presentation—a known obstetric emergency. Despite the hospital's lack of obstetric and neonatal intensive care capabilities, the medical staff proceeded with labor induction without appropriate consultation or transfer to a facility equipped to handle such high-risk deliveries. This conduct constitutes clear violations of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, as well as breaches of Ohio state laws pertaining to medical negligence and wrongful death.

2.      Upon arrival at the emergency department, I was left to wait in the Emergency Room for hours, after my water broke in the emergency room waiting area at around 3:40am, I was not provided with an adequate medical screening examination (MSE) as required under EMTALA (there was no OB on site nor Qualified Individual to perform the initial MSE). The attending physician Dr. Nathan Eikhoff failed to confirm fetal heart tones (he stated the baby's positioning would not allow for Dr. Nathan Eikhoff to perform a assessment with the equipment he had).

3.      When Dr. Nathan Eikhoff disclosed he could not assess my son's well being I asked to be transferred to University Hospital labor and delivery. Dr. Nathan Eikhoff denied my request stating there was no available ambulance did not provide Ems logs to confirm o allow for dispute. Dr. Nathan Eikhoff failed to assess cervical dilation adequately but still proceeded with labor, demanding me to push even though I was not comfortable doing so because my baby was pre-term. After pushing for over an hour with my son's head entrapped due to failure to MSE, Dr. Nathan Eikhoff continued with induction medication using Cytotec (misoprostol), a medication contraindicated in such scenarios without obstetric consultation or surgical backup. My explicit requests for transfer to a facility with appropriate obstetric and neonatal care were denied without documented risk-benefit analysis or informed consent, violating EMTALA's transfer requirements.

4.      Under EMTALA, hospitals are mandated to provide an appropriate MSE to determine if an emergency medical condition exists and to stabilize the patient or arrange for an appropriate transfer if the hospital lacks the capability to treat the condition. In my case, the hospital failed to perform a comprehensive MSE, did not stabilize my condition, and denied my request for transfer, all of which are direct violations of EMTALA provisions.

5.      Numerous federal courts have clarified that a failure to perform a timely and competent medical screening violates EMTALA, even if the patient was eventually seen by a physician. *Bryan v. Rectors and Visitors of Univ. of Virginia*, 95 F.3d 349 (4th Cir. 1996), held that screening must be "reasonably calculated to identify emergency medical conditions." In *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994), the court emphasized that unequal or delayed screening, especially where emergent signs are present, may constitute actionable EMTALA violations. Further, the CMS State Operations Manual (§ 3010–§ 3012) makes clear that patients in active labor or presenting with signs of fetal distress must receive immediate OB consultation or transfer to a capable facility. The omission of these steps at Marymount evidences an institutional breach of federal law.

6.      The American College of Obstetricians and Gynecologists (ACOG) considers footling breech presentations at preterm gestations as contraindications for vaginal delivery due to the high risk of complications. ACOG guidelines recommend cesarean delivery in such cases to minimize risks to both

mother and fetus. The decision to proceed with labor induction without obstetric consultation or surgical backup deviated from these established standards.

7.      Medical literature and clinical consensus also support that in cases of preterm breech presentation with ruptured membranes, the standard of care mandates immediate consultation with an obstetrician and transfer to a Level III facility. Expert medical testimony will confirm that failure to do so deviates grossly from accepted emergency obstetric protocols. Peer-reviewed studies and national benchmarks from ACOG, as well as the CDC's maternal mortality reduction initiatives, condemn reliance on emergency room generalists for complex fetal emergencies.

8.      Under Ohio Revised Code § 2125.01, a wrongful death claim arises when a death is caused by the wrongful act, neglect, or default of another. The hospital's actions, including the failure to provide appropriate medical care and the denial of transfer, directly resulted in the death of my son, constituting grounds for a wrongful death claim.

9.      The conduct of Cleveland Clinic Marymount Hospital and its staff represents a profound failure to adhere to federal and state laws, as well as established medical standards. This complaint seeks to hold the hospital accountable for its actions and to ensure that such violations do not recur, thereby safeguarding the rights and well-being of future patients.

10.     In fact, this is not the first time Cleveland Clinic has been cited for serious patient safety violations. In 2015, the Clinic was fined $600,000 by federal regulators after inspectors found systemic lapses that placed patients in "immediate jeopardy" — the most serious CMS designation short of license revocation. These findings, publicized by Cleveland.com, put the Clinic on formal notice of its deficient policies, yet those deficiencies persisted and were echoed in my experience on January 25–26, 2024.

11.     This action is timely filed within the applicable limitations period. The events at issue occurred on January 25–26, 2024. My formal grievances began shortly after becoming aware of applicable laws and regulations and culminated in a written intent to sue followed by a settlement demand served upon the Cleveland Clinic Foundation in May 2025. As of the date of filing, the Clinic has neither responded in good faith nor disclosed the full record. Under Ohio's discovery rule, the statute did not begin to run until I became aware of the extent of the falsification and concealment of records — which was not evident until I received partial records and discovered undisclosed addenda and inconsistencies. Equitable tolling

is also appropriate given the Clinic's refusal to produce critical information and my ongoing attempts to resolve this without litigation.

12.     As a Black uninsured woman , I was subjected to substandard care due to implicit bias and systemic disparities known to exist in emergency maternal health settings. Numerous studies establish racial disparities in triage urgency, pain response, and maternal health outcomes. These disparities were evident in my treatment and contributed to the delay, denial of care, and ultimate harm.

## II. JURISDICTION AND VENUE

13.      Federal Jurisdiction: This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. EMTALA mandates that hospitals provide appropriate medical screening and stabilizing treatment to individuals with emergency medical conditions. Violations of EMTALA provisions give rise to federal question jurisdiction.

14.     Supplemental Jurisdiction: Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state law claims, including wrongful death and medical negligence, as they are so related to the federal claims that they form part of the same case or controversy.

15.     Venue: Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this district, specifically at Cleveland Clinic Marymount Hospital located in Garfield Heights, Ohio.  I am the real party in interest for all personal claims and, as Personal Representative of the Estate of Amir Rodgers, am the proper party for all estate-based claims. I have not been adjudicated incompetent. There is no prior litigation or judgment involving these parties or claims.

### Applicable Laws and Regulations

16.     Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd: Requires hospitals to provide an appropriate medical screening examination and necessary stabilizing treatment for emergency medical conditions, and prohibits transfer of unstable patients unless certain conditions are met.

17.     Ohio Revised Code § 2125.01: Establishes the right to bring a civil action for wrongful death when the death is caused by wrongful act, neglect, or default.Ohio Laws

18.    Ohio Revised Code § 2125.02: Specifies the parties entitled to bring a wrongful death action and the types of damages recoverable, including loss of support, services, companionship, and mental anguish.

19.    Ohio Revised Code § 2305.113 (3): A person who commences an action upon a medical claim, dental claim, optometric claim, or chiropractic claim under the circumstances described in division (D)(1) or (2) of this section has the affirmative burden of proving, by clear and convincing evidence, that the person, with reasonable care and diligence, could not have discovered the injury resulting from the act or omission constituting the alleged basis of the claim within the three-year period described in division (D)(1) of this section or within the one-year period described in division (D)(2) of this section, whichever is applicable.

19a. **Tolling and Discovery Rule:** I did not know, and could not reasonably have known, that being left for hours in the emergency department lobby while in preterm labor, or the hospital's failure to provide timely screening, stabilization, and transfer, were violations of federal or state law until January 2025. At the time of the events, the medical staff did not inform me of my rights under the Emergency Medical Treatment and Labor Act (EMTALA) or that the care I received was improper. It was only in January 2025, after learning about EMTALA and patient rights in labor and delivery, that I realized the hospital's actions may have violated the law.

19b.    Upon discovering this, I immediately began seeking answers and diligently requested my complete medical records and electronic audit trails. My initial requests were ignored, delayed, or only partially fulfilled, and I encountered repeated stalling and incomplete responses from the hospital and its compliance department. It was not until I received additional records in 2025, after persistent follow-up and formal complaints, that I discovered key discrepancies, fabricated or backdated entries, and evidence of record manipulation. These facts were not reasonably knowable to me earlier, as the hospital's concealment and lack of disclosure prevented me from understanding the true nature and cause of my injuries. Because of these circumstances, the statute of limitations for my claims should be tolled under the discovery rule and principles of equitable tolling. The accrual of my claims is a fact question not suitable for resolution on the pleadings. For the wrongful death claim, this action was filed within two

years of the date of death, as required by O.R.C. § 2125.02(D). All claims are timely under the discovery rule, equitable tolling, and applicable statutes.

20.      Ohio Administrative Code § 3701-7-07, Rule 3701-22-23: Outlines the standards for obstetric services in hospitals, including requirements for staffing, equipment, and protocols for managing obstetric emergencies.

21.      American College of Obstetricians and Gynecologists (ACOG) Guidelines: Provide authoritative standards for obstetric care, including the management of preterm labor and breech presentations, and contraindications for the use of certain labor-inducing agents such as misoprostol (Cytotec) in specific clinical scenarios.

22.      The aforementioned statutes and regulations establish the legal framework under which the defendants' actions are evaluated, and their violations form the basis for the claims asserted in this complaint.

## III. PARTIES

23.      Plaintiff I, Whitnie Jackson am a Ohio resident residing in Cuyahoga County. I bring this action individually and as Personal Representative of the Estate of Amir Rodgers, Deceased. I assert personal claims in my own right and estate-based claims as Personal Representative.

24.      Defendant Cleveland Clinic Foundation is a nonprofit medical provider incorporated in Ohio with its principal place of business in Cleveland, Ohio. It operates Marymount Hospital, which maintains an emergency department and is obligated under EMTALA.

25.      Dr. Nathan Eikhoff

26.      Marymount John/Jane Doe" Medical staff defendants

## IV. FACTUAL ALLEGATIONS/LEGAL ARGUMENTS

27.      On January 25, 2024, I presented to Marymount Hospital at 28 weeks gestation with contractions, pelvic pressure, and concern for rupture of membranes.

28.      Contrary to hospital records stating a 3:36 AM arrival (EX A), I arrived at the emergency department after 11:00 PM and was left waiting unattended. The falsified arrival time compresses the care timeline, undermining the urgency and extent of the delay in screening and care. (see *Colacicco v. Apfel*, 110 F. Supp. 2d 303, 315 (E.D. Pa. 1999)) and as a violation of *42 CFR § 482.24* which mandates

accurate and timely medical documentation. At no point did I sign a consent form at 3:38 a.m. nor did I arrive at 3:36am These clearly edited timestamps are after I had already been waiting for several hours, effectively compressing the undocumented lobby delay and concealing the fact that my membranes had ruptured well before triage

29.     After waiting in the lobby from 11pm till after 3:40am in the morning my water broke, I was told my son was in a footling breech position—a medical emergency requiring immediate consultation with an OB/GYN and transfer to a Level III neonatal intensive care unit per ACOG and CMS EMTALA guidelines.

29a.     At all relevant times, Dr. Nathan Eikhoff and the staff at Marymount Hospital recognized that I was experiencing an obstetric emergency—specifically, preterm labor with a footling breech presentation and ruptured membranes. Despite this, they failed to follow the standards for obstetric emergencies set forth in Ohio Administrative Code § 3701-7-07 and Rule 3701-22-23, which require hospitals to maintain appropriate staffing, equipment, and protocols for managing such emergencies.  The hospital did not provide immediate obstetric consultation, continuous fetal monitoring, or timely transfer to a facility with higher-level care, as required by these regulations and by hospital policy. The failure to follow these mandatory standards directly contributed to the inadequate screening, lack of stabilization, and denial of transfer that resulted in the death of my son.

29b.     At the time of my admission, I was less than thirty-five weeks pregnant and presented with a complicated obstetric condition—preterm labor with a footling breech presentation and ruptured membranes. Under Ohio Administrative Code § 3701-7-07(B), a Level I obstetrical service is required to transfer any pregnant woman for intrapartum care to a higher-level facility (Level II, III, or IV) if she is less than thirty-five weeks pregnant or has a complicated condition beyond the service's designated capabilities. The only exception is if, in the clinical judgment of a qualified obstetrical practitioner, there is inadequate time to effect a safe transfer before delivery or if transfer would pose a threat to the health or safety of the mother or fetus. No such clinical judgment was documented or communicated to me, and there was adequate time and opportunity to arrange a transfer to University Hospitals, which I repeatedly requested.

30.     Marymount is not listed by the Ohio Department of Health as a Level III Neonatal Intensive-Care provider, and therefore lacked the capability to effectively screen or stabilize a 28-week plus neonate.

31.     No OB/GYN was physically present at my bedside before staff told me to begin pushing.

32.     The administration of Cytotec (misoprostol), a uterotonic drug contraindicated in premature breech pregnancies absent full cervical evaluation.

33.     No fetal heart tones or demise were confirmed prior to Cytotec administration, no analgesia was given until 05: 24 a.m., nearly an hour after active pushing began, as shown in the Medication Administration Record.

34.     ACOG's Committee Opinion No. 687 and Clinical Bulletin No. 107 establish that in suspected preterm labor with breech presentation, full evaluation of fetal well-being, cervical dilation, and maternal stability must precede any attempt to induce or augment labor. Marymount violated Ohio Admin Code § 3701-83-19 by failing to have OB/GYN staff available to respond to obstetric emergencies as required under the Code's standards for OB services in hospitals with emergency departments.

35.     Defendant failed to perform or document a digital cervical exam, ultrasound confirmation of presentation, or consultation with the on-call obstetrician.

36.     EMTALA (42 U.S.C. § 1395dd(a)) mandates an "appropriate medical screening examination" to determine whether an emergency medical condition exists. The screening provided to Plaintiff did not meet this standard.

37.     Defendant failed to stabilize me and my son (42 U.S.C. § 1395dd(b)), instead instructing me to push causing my sons head to become entrapped from failure to properly screen(MSE).

38.     My sons head was entrapped an hour or longer as I continually pushed, Dr. Nathan Eikhoff induced with Cytotec when pushing "stalled" without OB-GYN on site, surgical back-up or neonatal care on standby.

39.     Defendant failed to initiate transfer under EMTALA's transfer mandate (42 U.S.C. § 1395dd(c)), and did not provide the required physician certification or documentation of informed consent or refusal.

40.     I requested help and clarification multiple times and was ignored. My mother and partner were present and heard staff express confusion about next steps and noted the absence of OB guidance.

41.     No OB was physically present in the room during delivery. The chart falsely reflects labor progression and fails to include contemporaneous fetal assessments or demise or valid consent documentation.

41a.     At the time of my prolonged wait in the emergency department lobby on January 25–26, 2024, I did not know that such treatment could constitute a violation of the Emergency Medical Treatment and Labor Act (EMTALA) or my patient rights. The hospital staff did not inform me of any rights or legal protections, and I had no medical or legal training to recognize that the care I received was improper. It was only in January 2025, after learning about EMTALA and patient rights in labor and delivery, that I understood the significance of the hospital's actions and omissions. Upon this discovery, I acted promptly and diligently to obtain records, file grievances, and pursue my claims, but was met with repeated delays, incomplete disclosures, and stalling by the hospital and its agents. These facts support application of the discovery rule and equitable tolling to all claims.

42.     I submitted a HIPAA amendment request on April 30, 2025, detailing these omissions. The hospital refused to amend the record.

43.     I submitted a formal EMTALA complaint to the Ohio Department of Health (ODH) and later to CMS Region V. ODH performed an investigation based solely on incomplete medical records, failing to interview witnesses or consider my documentation and concerns.

44.     On April 22, 2025, I submitted a rebuttal with sworn declarations, ACOG citations, and a request to reopen the investigation under CMS SOM § 5075 and § 5410.

45.     On May 13, 2025, Cleveland Clinic's Ombudsman canceled a scheduled May 14, 2025 meeting with their physician, after Plaintiff mentioned her intent to pursue legal action.

46.     The Ombudsman confirmed during the call that the institution considered the complaint "resolved" and would make no changes to the medical record or engage further.

**EXHAUSTION OF REMEDIES**

47.     I have submitted formal complaints and amendment requests with the Cleveland Clinic's Compliance Department, Ombudsman, and relevant regulatory agencies, including the Ohio Department of Health and the Centers for Medicare and Medicaid Services (CMS). These efforts were obstructed or dismissed and was only met by delay and stalling from January to May 2025, satisfying any

administrative prerequisites and demonstrating futility of internal remedies under applicable law. I also submitted HIPAA requests for amendment and audit logs under 45 C.F.R. §§ 164.524 and 164.526 and received no compliance. These facts further justify judicial intervention and equitable relief.

48.     I did not discover the true nature of the misconduct that led to my injuries until well after the January 25–26, 2024, incident. Cleveland Clinic and Marymount Hospital engaged in a pattern of misrepresentation, concealment, and record manipulation that prevented me from reasonably knowing that the harm I experienced was the result of medical negligence and legal violations.

49.     Specifically, I found out about EMTALA Laws in January 2025,, my initial request for records was ignored, delayed, and ultimately responded to only in part — and only after my formal demand letter was sent in May 2025. It was not until receipt of those post-demand documents that I discovered multiple fabricated or backdated entries, including a consent form allegedly signed at 3:38 AM, despite my arrival time being falsely charted as 3:36 AM and my documented admission at 3:51 AM. The handwriting on that form is not mine, and the form was never reviewed with me. Additional discrepancies in vitals, notes, and audit trail absences confirmed for me — for the first time — that the record had been retroactively altered and that the true scope of the violations had been concealed.

50.     Because of these distortions and the refusal to disclose failures during care, and provide timely access to audit logs and electronic records after care, I could not reasonably discover that the injuries and loss I suffered were the result of actionable negligence. Under Ohio law, and in line with Oliver v. Kaiser Cmty. Health, 5 Ohio St.3d 111 (1983), the statute of limitations for medical malpractice begins when the plaintiff knows or should know that an injury occurred and that it may be related to medical conduct. I could not make that determination without honest access to my own record and disclosure and accountability— access that was deliberately obstructed.

51.     Accordingly, I invoke the discovery rule and request equitable tolling of all relevant statutes, including but not limited to O.R.C. § 2305.113.

52.      I have acted diligently since the moment I discovered the facts giving rise to this complaint and did everything in my power to investigate, clarify, and assert my rights within a reasonable time.

53.     The acts and omissions of the Defendants deprived me of rights secured by the Constitution, including:

a) The right to substantive due process under the 14th Amendment — specifically the right to life and bodily integrity;

b) The right to procedural due process — by failing to provide appropriate and timely medical care without adequate justification or safeguards; and

c) The right to be free from state-created danger and deliberate indifference to serious medical needs

54.     Given the Clinic's history of systemic failures in patient safety — including a documented $600,000 civil penalty issued by the Centers for Medicare & Medicaid Services in 2015, in which patients were placed in "immediate jeopardy" due to record keeping and procedural deficiencies — I believe the conduct in my case reflects not a deviation, but a continuation of entrenched institutional dysfunction. These failures transcend departments and reflect a governance-level disregard for federal compliance, patient rights, and internal accountability. I bring this case not only to redress my own harm, but to confront a systemic pattern that has persisted despite federal sanctions

## V.  CAUSES OF ACTION

### COUNT I – EMTALA VIOLATION: CLEVELAND CLINIC D.B.A MAYMOUNT FAILURE TO PROVIDE APPROPRIATE MEDICAL SCREENING (42 U.S.C. § 1395DD(A))

55.     On or about January 25–26, 2024, I arrived at Marymount Hospital's Emergency Department in active pre-term labor waiting for hours in the waiting room lead to ruptured membranes, painful contractions, and a documented footling breech presentation. EMTALA obligated the hospital to provide me with timely treatment,  an appropriate medical screening examination ("MSE")—an exam reasonably calculated to detect or rule out an emergency medical condition and administered uniformly to all obstetric patients with comparable signs and symptoms. Instead, the attending emergency physician, Dr. Nathan Eikhoff, limited his evaluation to a brief bedside ultrasound/doppler that failed to capture fetal heart tones (due to positioning of my son), biometry, presentation, or viability; I was not given a formal obstetric ultrasound, continuous fetal monitoring, pelvic digital exam, or laboratory work-up, and no obstetrician was summoned despite hospital policy requiring OB consultation for breech or pre-term presentations. This perfunctory screening departed from the hospital's customary obstetric protocol and

thereby violated 42 U.S.C. § 1395dd(a), which safeguards equal treatment rather than a malpractice standard. By denying me a comprehensive MSE reasonably calculated to identify an obstetric emergency, Marymount exposed me and my fetus to unmanaged and foreseeable peril, satisfying the statutory elements of an EMTALA screening violation. The medical record falsely suggests that sufficient screening was performed, contradicting Dr. Eikhoff's own admission that he was unable to determine fetal heart tones or confirm viability likely because he was not adequately trained or qualified in obstetric emergencies.

## COUNT II – EMTALA VIOLATION: CLEVELAND CLINIC D.B.A MAYMOUNT FAILURE TO STABILIZE (42 U.S.C. § 1395DD(B))

56.      After Dr. Eikhoff identified a footling breech presentation with ruptured membranes—an emergency obstetric condition—EMTALA required Marymount Hospital to provide stabilizing treatment within its capabilities or arrange an appropriate transfer so that, within reasonable medical probability, no material deterioration of my or my fetus's condition would occur. 42 C.F.R. § 489.24(d); Burditt v. U.S. HHS, 934 F.2d 1362, 1371–72 (5th Cir. 1991); CMS State Operations Manual, App. V, Tag A-2407. Instead, I was instructed to push without confirmation of cervical dilation, continuous fetal monitoring, or obstetric consultation. An unidentified OB, contacted only by telephone, ordered buccal Cytotec—an induction agent contraindicated in breech labor—which further destabilized the situation. The hospital lacked on-site OB and NICU support yet neither stabilized me nor my unborn son before continuing active delivery and ultimately transferring me. Under Sixth-Circuit precedent, a patient is "stabilized" only when the condition is not likely to deteriorate on transfer or discharge; Marymount's actions plainly fell short of that standard, constituting a direct violation of 42 U.S.C. § 1395dd(b).

## COUNT III – EMTALA VIOLATION: CLEVELAND CLINIC D.B.A MAYMOUNT FAILURE TO EFFECTUATE APPROPRIATE TRANSFER (42 U.S.C. § 1395DD(C))

57.      Defendants failed to comply with both federal law (EMTALA, 42 U.S.C. § 1395dd(c)) and Ohio Administrative Code § 3701-7-07(B) by refusing to transfer me to a higher-level facility despite my preterm status and complicated presentation. There is no documentation or evidence that a qualified obstetrical practitioner determined that transfer was unsafe or that there was inadequate time to effectuate a transfer before delivery. The hospital did not obtain or present a written physician certification, nor did

it secure an accepting facility or arrange prompt transport, as required by both federal and state law. These failures constitute violations of both EMTALA and Ohio's mandatory standards for Level I obstetric services. EMTALA requires a hospital that lacks adequate stabilizing capabilities to (a) obtain written physician certification that the medical benefits of in-house care outweigh the risks of transfer, or (b) secure an accepting facility and arrange prompt transport. No such certification appears in my chart, and I was never presented with an informed-refusal form.

58.     The hospital also failed to document any call to emergency medical services or to University Hospitals.  Courts hold that unverified assertions of non-transferability, absent supporting records, violate EMTALA's transfer clause.  See Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia, 524 F.3d 54, 61–62 (1st Cir. 2008).  Marymount's unexplained refusal to request an ambulance or to negotiate an inter-facility hand-off deprived me and my fetus of the stabilizing resources that University Hospitals could have provided.  Because Marymount neither stabilized my emergency obstetric condition nor executed a legally compliant transfer, it breached the mandatory duties imposed by 42 U.S.C. § 1395dd(c), subjecting the hospital to EMTALA liability for its failure to honor my explicit transfer requests. Marymount has previously faced reversal for unsafe discharge decisions (Groves v. Ihsanullah, supra), highlighting its ongoing disregard for patient safety, showing a pattern of Emtala decisions having deadly consequences. See Everhart v. Coshocton County Mem. Hosp., 2017-Ohio-843 (Ohio Sup. Ct. 2017), confirming that a hospital's failure to properly escalate or transfer a patient in emergent obstetric distress constitutes negligence under Ohio law and supports a viable claim for wrongful death of a fetus when the child had a reasonable probability of survival with proper care.

## COUNT IV – DR. NATHAN EIKKOFF/ CLEVELAND CLINIC MEDICAL NEGLIGENCE / MALPRACTICE (OHIO COMMON LAW)

59.     Dr. Nathan Eikhoff and the nursing staff owed me—and my unborn son—a duty to provide care consistent with accepted obstetric standards in Ohio. They breached that duty by (a) failing to perform a cervical digital exam before directing me to push, (b) ignoring the need for immediate obstetric consultation and surgical backup for a footling breech, (c) administering buccal Cytotec despite guidelines contraindicating induction agents in active breech labor, and (d) pulling on my baby's legs without an operating team on standby, resulting in head entrapment and irreversible hypoxia.

59a.     Defendants breached their duty of care by failing to follow the mandatory transfer protocols set forth in Ohio Administrative Code § 3701-7-07(B). Marymount Hospital was required to transfer me to a higher-level facility for intrapartum care because I was less than thirty-five weeks pregnant and presented with a complicated condition. Defendants did not document any clinical judgment that transfer was unsafe or impossible, nor did they attempt to arrange a transfer as required. This breach of statutory and regulatory duty directly resulted in the injuries and death suffered.

59b.     The exception in Ohio Administrative Code § 3701-7-07(B) does not apply here. There is no evidence that a qualified obstetrical practitioner determined that transfer was unsafe or that there was inadequate time to effectuate a transfer. In fact, I was left waiting for hours in the emergency department, and my repeated requests for transfer after  screening were denied without any documented risk–benefit analysis or informed refusal. These facts coupled with the use of Cytotec after an hour of pushing instructions shows there was time for transfer The hospital's failure to comply with the mandatory transfer requirement was not justified by any clinical necessity. The violation of Ohio Administrative Code § 3701-7-07(B) and related regulations constitutes negligence per se under Ohio law, as these provisions are designed to protect patients in my situation and to prevent precisely the type of harm that occurred here

60.     These departures from the standard of care were the proximate cause of my son's death and my own physical and emotional injuries. Hillcrest Hospital's subsequent documentation of "fetal demise prior to arrival" underscores that Marymount's mismanagement during the critical window of care was fatal.

61.     Because Marymount withheld material portions of my chart, failed to disclose audit-trail logs, and produced an consent form mis-timestamped never signed by me I never saw, which would assert that I signed the consent form 4 minutes after entering the hospital by there account (which is false), this would place signing the consent prior to screening. I invoke Ohio's discovery rule and equitable tolling under R.C. 2305.113(B). The Clinic's concealment prevented me from learning the full extent of its negligence until I obtained additional records in 2025, and I have proceeded diligently since that discovery.

62.     The Clinic's failures did not occur in isolation. In 2015 the same institution was cited and fined by federal regulators for systemic safety lapses that endangered patients. The recurrence of similar deficiencies in my 2024 care shows a continuing pattern of institutional indifference.

63.     Cleveland Clinic leadership knew—or should have known—its emergency-triage and obstetric protocols were dangerously deficient, yet failed to implement lasting reforms after the 2015 sanctions. That conscious disregard for patient safety directly enabled the cascade of negligent acts that led to my son's preventable death. Defendants' breaches reduced my son's probability of survival from well over 50 percent to zero, fitting the 'substantial chance' test recognised in Roberts v. Ohio Permanente, 76 Ohio St.3d 483 (1996).

## COUNT V – WRONGFUL DEATH OF A VIABLE FETUS AND SURVIVAL (OHIO REV. CODE § 2125.01) PERSONAL REPRESENTATION ON BEHALF OF AMIR RODGERS (DECEASED)

64.     At 28-plus weeks' gestation my son was presumptively viable: national outcome studies show that 80 %–85 % of infants delivered after 28 weeks survive with modern NICU care.  Had Marymount transferred me to a tertiary center—or simply followed accepted obstetric protocols—my child more likely than not would have lived. A footling-breech stillbirth in an emergency department absent operative OB intervention does not ordinarily occur without negligence; the instrumentalities were under Defendants' exclusive control, satisfying Ohio's res ipsa requirements

65.     Ohio law recognizes a cause of action for the wrongful death of a viable fetus.  See Werling v. Sandy, 17 Ohio St. 3d 45 (1983) (holding that a viable fetus qualifies as a "person" under Ohio Rev. Code § 2125.01). By negligently refusing transfer, withholding stabilizing care, and employing hazardous maneuvers that entrapped my baby's head, Cleveland Clinic directly caused his stillbirth.  The hospital then laid his body—unwrapped—on a steel table in front of me, my mother, and the child's father, compounding our trauma and satisfying the "mental anguish" element of wrongful-death damages.

66.     I, Whitnie Jackson, as the duly appointed Personal Representative of the Estate of Amir Rodgers, bring this survival claim under Ohio law, including Ohio Revised Code § 2305.21, for the injuries and damages suffered by Amir Rodgers prior to his death. I incorporate by reference all preceding paragraphs as if fully set forth herein. On January 25–26, 2024, my son, Amir Rodgers, was a viable fetus and patient at Marymount Hospital, under the care and supervision of the defendants.

66a.    As described above, the defendants failed to provide appropriate medical screening, stabilization, and transfer, and failed to follow the required standards of care for obstetric emergencies, including those set forth in Ohio Administrative Code § 3701-7-07 and Rule 3701-22-23.

66b.     As a direct and proximate result of the defendants' acts and omissions, Amir Rodgers suffered

conscious pain and suffering, distress, and pre-death injuries, including but not limited to hypoxia,

trauma, and loss of chance of survival, prior to his death. Under Ohio's survival statute, I, as Personal

Representative, am entitled to recover damages for all injuries, pain, and suffering, incurred by Amir

Rodgers prior to his death, as well as any other damages that survive to the estate under Ohio law. I, as

Personal Representative of the Estate of Amir Rodgers, respectfully request judgment against the

defendants for all damages recoverable under Ohio law for pre-death injuries, pain and suffering, medical

expenses, and such other relief as the Court deems just and proper.

## COUNT VI – SPOLIATION OF EVIDENCE (OHIO COMMON LAW)

67.     On and after January 20, 2025, I was actively seeking answers regarding the care provided to me

and my son at Marymount Hospital. I submitted formal HIPAA requests for my complete medical records,

including audit trails and version histories, under 45 C.F.R. § 164.524 and Ohio Rev. Code § 3701.74,

beginning in January 2025. I also filed complaints with the Cleveland Clinic Compliance Department, the

hospital Ombudsman, and state and federal regulatory agencies. These actions put defendants on notice of

probable litigation.

67a.     Defendants were aware, or should have been aware, that litigation was probable based on my

repeated, formal requests for records, audit logs, and my grievances and complaints, all of which

referenced concerns about the care provided and the need for a full investigation. The chart Cleveland

Clinic finally produced omits entire threads of communications, early vital-sign entries, and key consent-

or-refusal documents. A "Consent to Treatment" form later surfaced that is not in my handwriting.

Several entries are stamped "addendum" hours after the events yet purport to describe real-time care. The

original triage was itself belated and compressed the earlier waiting-room delay covering up an

embarrassing delay by back-setting the encounter start to when triage finally noticed me when my water

broke in the lobby. My HIPAA and Ohio Rev. Code § 3701.74 requests for the complete audit-trail logs

and version history have gone unanswered—depriving me of the electronic fingerprints that would show

when, and by whom, the record was altered.

68.     Although the signature on the 3:38 a.m. 'Patient Acknowledgement and Consent' scan appears

to be mine, the check-boxes and handwriting on the form were completed by someone else, and no staff

member disclosed treatment risks to me at that time. The consent form is timestamped 3:38 a.m.—just two minutes after my arrival (3:36 a.m.) and eleven minutes before the first vitals (3:49 a.m.). I did not sign it knowingly or voluntarily. Courts treat back-dated or out-of-sequence documents as evidence of fabrication. See Rimkus Consulting Grp., Inc. v. Cammarata, 688 F. Supp. 2d 598, 614–15 (S.D. Tex. 2010) (imposing sanctions for altered time-stamps).

69.     A nursing note at 3:43 a.m. states that I "did not appear in distress," yet two minutes later my heart rate was 112 bpm with elevated blood pressure—objective signs of distress. Such internal contradictions support an inference of deliberate minimization. See Zubulake v. UBS Warburg LLC ("Zubulake V"), 229 F.R.D. 422, 431–33 (S.D.N.Y. 2004) (conflicting contemporaneous records justify an adverse-inference instruction). The triage note stating I 'did not appear in distress' bears a service time of 03:46 a.m. but an Epic creation time of 04:15 a.m.—thirty minutes later, after my tachycardia (HR 112) and elevated blood pressure were documented. This delayed entry was intentionally back-dated to blunt the appearance of clinical urgency and therefore constitutes a 'significant alteration' under Smith v. Howard Johnson.

70.     Some of the chart entries were filed retrospectively after my son's death; several are "stacked" in Epic so the time-line appears continuous, masking gaps in care. Missing time-stamps, altered sequencing, and the absence of audit logs together trigger the bad-faith presumption recognized in spoliation jurisprudence. The chart was reopened four days later, on January 30 2024 at 11:59 a.m., to file an additional 'Clinical Notes – Procedures' entry without the required 'Late Entry/Addendum' label. This silent overwrite violates CMS § 482.24 and mirrors the earlier timing manipulations—evidence of a coordinated effort to reconstruct the record once it was clear my son had died. Pursuant to Fed. R. Civ. P. 37(e)(2) and Smith v. Howard Johnson*, 67 Ohio St.3d 28 (1993), I request an adverse-inference instruction that any deleted or withheld audit-trail data would corroborate my timeline.

71.     Ohio recognizes an independent tort for intentional spoliation of evidence. The elements are: (1) pending or probable litigation, (2) defendant's knowledge of that likelihood, (3) willful destruction or alteration of evidence designed to disrupt the plaintiff's case, (4) actual disruption, and (5) resulting damages. Smith v. Howard Johnson Co., 67 Ohio St. 3d 28, 29–30 (1993). By withholding audit trails,

producing a suspect consent form, and retro-editing the chart, Cleveland Clinic knowingly interfered with my ability to prove EMTALA and malpractice claims—satisfying every Smith element.

72.     I therefore seek all remedies available for intentional spoliation, including adverse-inference instructions, exclusion of the tainted records, monetary sanctions, and any other relief the Court deems just.

73.     The Clinic's refusal to produce complete records — including audit trails, metadata, and accurate time-stamped consent forms — further supports an inference of intentional spoliation. My formal HIPAA request under 45 C.F.R. § 164.524 was ignored. As in Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003), the failure to preserve and produce electronic records may justify adverse jury instructions. Moreover, the altered entries, withheld logs, and unexplained backdating support a finding that the records were intentionally manipulated after the fact to obscure liability.

73a.    The absence of these records has materially impaired my ability to prove the sequence of care, the timing of interventions, and the authenticity of the chart, directly prejudicing my EMTALA and malpractice claims.

73b.    Under Smith v. Howard Johnson Co., 67 Ohio St.3d 28, 29–30 (1993), the elements of intentional spoliation are: (1) pending or probable litigation, (2) defendant's knowledge of that likelihood, (3) willful destruction or alteration of evidence designed to disrupt the plaintiff's case, (4) actual disruption, and (5) resulting damages all of which are preset here.

## COUNT VII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (OHIO COMMON LAW)

81.     I lay helpless while my baby died in front of me—still partially entrapped—while staff congratulated themselves on "delivering their first baby."  I was denied pain relief, denied the transfer I had begged for, and forced to watch the lifeless body of my son placed on a cold steel table.  The experience plunged me into panic attacks, flashbacks, and relentless nightmares; I have since been formally diagnosed with post-traumatic stress disorder and generalized anxiety disorder as well as depression.

82.     Ohio recognizes a cause of action for negligent infliction of emotional distress when a plaintiff directly witnesses negligent conduct that foreseeably results in severe, debilitating psychological injury—

even absent contemporaneous physical harm. Paugh v. Hanks, 6 Ohio St. 3d 72, 80 (1983); Binns v. Fredendall, 32 Ohio St. 3d 244, 245–46 (1987) (parents who witnessed injury to child may recover for emotional trauma). Watching my son's preventable death, while myself in active labor, squarely meets that standard—the trauma was immediate, the emotional harm is medically documented, and the causal link to Defendants' negligence is direct.

83.     As a proximate result of this negligent infliction of emotional distress, I have incurred ongoing therapy expenses, lost wages, and profound loss of enjoyment of life. I therefore seek compensatory damages for all mental anguish, medical costs, and other losses proved at trial, together with any additional relief the Court deems just.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OHIO COMMON LAW)

84.     Defendants' conduct was outrageous: they forced me to push a footling-breech fetus without anesthesia, lied about ambulance availability, denied my repeated transfer requests, and then placed my lifeless baby—unwrapped—on a cold steel table while staff congratulated themselves on a "first delivery." Such actions go beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.

85.     The emergency-department team acted with intent to cause—or, at minimum, with reckless disregard for the near-certainty of causing—severe emotional harm. Their own policies warned of the psychological impact of traumatic deliveries, yet they ignored basic obstetric standards and my explicit pleas for help.

86.     Their conduct directly caused my ongoing post-traumatic stress disorder, generalized anxiety, and major depressive episodes, all documented by licensed mental-health professionals. The temporal proximity between their actions and my diagnoses confirms causation.

87.     The emotional distress I suffer is severe and debilitating: daily flashbacks, panic attacks, prolonged insomnia, and an inability to resume normal family routines. These symptoms meet—and exceed—the threshold Ohio courts set for IIED recovery under Yeager, Reamsnyder v. Jaskolski, 10 Ohio St. 3d 150 (1984), and their progeny.

88.     I therefore seek all compensatory damages allowed for intentional infliction of emotional distress, as well as punitive damages to deter similar conduct in the future, together with any additional relief the Court deems just.

## COUNT IX – FRAUDULENT MISREPRESENTATION AND CONCEALMENT (OHIO COMMON LAW)

89.     During my January 25–26, 2024 visit, Marymount staff told me: (a) no ambulance was available, (b) an obstetrician was "right here" and monitoring my case, and (c) I was being placed on continuous fetal monitoring.  All three statements were false.  In reliance on those assurances I remained at Marymount instead of arranging my own transfer to University Hospitals, thereby forfeiting the timely NICU care that could have saved my son.

90.     After the fact, Defendants back-filled the chart with entries suggesting I "refused" transfer and that fetal monitoring occurred.  They then withheld the audit-trail data and version history that would expose those retroactive edits.  Under Ohio law, a party with superior knowledge and a duty to disclose may not conceal material facts or furnish partial truths that become misleading.  See Gaines v. Preterm-Cleveland, Inc., 5 Ohio St. 3d 47 (1983).

91.     Defendants made these misrepresentations and omissions with the intent— or, at minimum, reckless disregard—of inducing me to stay at their under-equipped facility and avoid a reportable EMTALA transfer.  I justifiably relied on their expertise and sustained the ultimate injury: the wrongful death of my viable fetus and severe personal trauma.

92.     All elements of common-law fraud and fraudulent concealment are therefore met: (1) false representations or material omissions, (2) knowledge of falsity, (3) intent to mislead, (4) justifiable reliance, and (5) proximate damages.  Accordingly, I seek rescissory and compensatory damages, punitive damages, and any other relief the Court deems just.

## COUNT X – BREACH OF FIDUCIARY DUTY / SPECIAL RELATIONSHIP (OHIO COMMON LAW)

93.     A hospital–patient relationship is fiduciary in nature: once Marymount accepted me into its Emergency Department, it owed me duties of loyalty, good faith, candor, and the exercise of its superior medical knowledge solely for my benefit.  See Stone v. Davis, 66 Ohio St. 2d 74, 78 (1981) (fiduciary

arises when one person places special confidence in another); Biddle v. Warren Gen. Hosp., 86 Ohio St. 3d 395, 403 (1999) (hospital's duties toward patient are fiduciary and include full disclosure of material facts).

94.     Marymount breached those duties by (a) falsely assuring me that transfer was impossible, (b) concealing its lack of on-site OB and NICU capacity, (c) forging or back-dating a "Consent to Treatment" form, and (d) withholding audit-trail metadata needed to verify the integrity of my chart—all to protect the hospital's financial and reputational interests at the expense of my safety and my son's life.

95.     This breach of fiduciary duty was a proximate cause of my son's wrongful death and my own severe physical and emotional injuries.  Had the hospital fulfilled its duty of candor—by disclosing its limitations and arranging an immediate transfer—I would have received appropriate tertiary-level care, and my son would, more likely than not, have survived.

96.     I therefore seek compensatory damages for all losses flowing from this breach, punitive damages to deter similar misconduct, and any equitable relief the Court deems just and proper.

## COUNT XI – CIVIL CONSPIRACY (OHIO COMMON LAW)

97.     Multiple actors inside Cleveland Clinic—including Dr. Eikhoff, charge nurses, records-management clerks, and ombudsman personnel—coordinated to delay my transfer, falsify or back-date chart entries, and stonewall my subsequent record-access requests.  Their concerted objective was to conceal the hospital's EMTALA violations and shield the institution from liability.

98.     This malicious combination of two or more persons achieved its goal through unlawful acts (spoliation, fraud, breach of fiduciary duty) and lawful acts carried out by unlawful means (withholding audit-trail metadata in violation of HIPAA's Right-of-Access rule).  See Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 419–20 (1995) (setting forth civil-conspiracy elements).

99.     The conspiracy directly impeded my ability to obtain timely, life-saving care for my son and later obstructed my investigation and legal redress.  As a result I suffered the wrongful death of a viable fetus, severe emotional distress, and litigation expenses—all recoverable as damages flowing from the conspiracy.

100.     I therefore seek joint-and-several liability for all co-conspirators, compensatory damages commensurate with my injuries, punitive damages to deter future conspiracies, and any additional relief the Court deems just.

## COUNT XII – NEGLIGENT SUPERVISION AND TRAINING (OHIO COMMON LAW)

101.     Defendant Cleveland Clinic, through its leadership and policymakers, failed to implement or enforce adequate protocols, policies, and staff training to ensure timely triage and life-saving intervention in obstetric emergencies. On information and belief, Cleveland Clinic has a custom or practice of deprioritizing maternal and fetal emergencies involving Black women and Medicaid patients. This pattern of indifference reflects institutional deliberate indifference and supports municipal liability under Monell v. Dept. of Social Services, 436 U.S. 658 (1978).

102.     Several nurses told me this was "our first delivery" and were visibly excited rather than prepared; no one intervened when Dr. Eikhoff deviated from obstetric protocol, pulled on my baby's legs, or administered Cytotec in a footling breech.  Their inexperience and failure to escalate care show a systemic lack of training and supervision.

103.     Cleveland Clinic owed a duty to hire competent staff and to train and supervise them so they would follow established obstetric and EMTALA policies.  See Steppe v. Kmart Stores of Ohio, 136 Ohio App. 3d 454, 465 (8th Dist. 2000) (employer liable when inadequate supervision allows foreseeable harm); Evans v. Ohio State Univ., 112 Ohio App. 3d 724, 739 (10th Dist. 1996).

104.     The Hospital also failed to train or supervise its Health Information Management personnel to comply with HIPAA's Right-of-Access and amendment rules.  Their repeated refusal to produce audit-trail metadata and the re-scanned, altered pages in my chart show negligent oversight of employees whose job was to safeguard the integrity of medical records.

105.     These supervision and training failures were a foreseeable and proximate cause of my son's death, my own physical injuries, and the obstruction of my legal remedies.  Had staff been properly trained—and HIM personnel properly supervised—my baby would have received timely, competent care, and I would have obtained unaltered records without costly litigation.

106.     I therefore seek compensatory damages for all losses attributable to the Clinic's negligent supervision and training, together with punitive damages and any further relief the Court deems just.

**COUNT XIII – BATTERY (AGAINST ALL DEFENDANTS WHO PARTICIPATED IN NON-CONSENSUAL CONTACT)**

107.     I incorporate by reference all preceding paragraphs as if fully set forth herein.

On January 25–26, 2024, while I was a patient at Marymount Hospital, agents and employees of the defendants, including but not limited to Dr. Nathan Eikhoff and nursing staff, intentionally performed medical procedures and interventions upon my person—including, but not limited to, the administration of Cytotec (misoprostol) for labor induction and the act of instructing and compelling me to push—without my informed consent and without providing adequate information about the nature, risks, or alternatives to these procedures.

108.     The attending physician admitted that he was unable to obtain fetal heart tones or imaging due to the fetus's position, yet proceeded to induce labor and direct me to push, without advising me of the risks, without disclosing whether my child was alive or deceased, and without providing or offering pain management, despite my requests. My explicit requests for transfer to a higher-level facility were also denied without explanation or documentation.

109.     I did not knowingly or voluntarily consent to the administration of Cytotec, the induction of labor, or the forced pushing. I was not informed of the risks, benefits, or alternatives, nor was I given an opportunity to refuse or meaningfully participate in the decision-making process.

110.     The "Patient Acknowledgement and Consent" form that defendants rely on to claim my consent is timestamped at 3:38 a.m.—just two minutes after my charted arrival time of 3:36 a.m., and eleven minutes before the first recorded vital signs at 3:49 a.m. However, my actual arrival at the emergency department was shortly after 11:00 p.m., and my documented admission was not until 3:51 a.m. The handwriting and check-boxes on the consent form were completed by someone else, and the form was never reviewed or explained to me at the time of signature. The timing and sequence of these entries are inconsistent with the actual course of events and suggest that the consent form was completed and backdated after the fact, rather than contemporaneously with my care.

111.     The implications of these timing discrepancies are significant: the consent form cannot be considered valid or informed when it was allegedly signed before I was even fully admitted, before any meaningful discussion of risks or alternatives, and before any assessment of my or my child's condition.

Courts treat back-dated or out-of-sequence consent documents as evidence of fabrication and as undermining any claim of valid consent.

112.     The above-described acts constituted intentional, harmful, and offensive physical contact with my person, performed without my valid consent, and were not justified by any medical emergency or necessity.

113.     As a direct and proximate result of these non-consensual contacts, I suffered physical pain, emotional distress, loss of autonomy, and other damages as set forth in this complaint.

**PRAYER FOR RELIEF**

WHEREFORE, I respectfully demand Given the Clinic's history of systemic safety failures, including the documented 2015 CMS penalty, its conduct in my case constitutes not only negligence but **willful disregard for known risks**. I therefore request:

  • Compensatory damages for wrongful death, emotional distress, pain and suffering, and loss of companionship;
  • Punitive damages in an amount sufficient to deter future misconduct;
  • Medical expenses and all out-of-pocket costs;
  • Attorney fees (if I later retain one) under 42 U.S.C. §1988;
  • Any other relief this Court deems just and proper;
  • I also respectfully demands a trial by jury on all triable issues.

In addition to compensatory damages and statutory remedies, I respectfully request **injunctive relief** to prevent ongoing and future harm — both to myself and to similarly situated patients — resulting from the Cleveland Clinic Foundation's systemic failure to comply with federal and state health care obligations. The violations detailed in this complaint were not isolated. They reflect broader institutional failures in record keeping, patient consent, audit trail transparency, and emergency medical transfer policy. I therefore request that this Court:

  • Order the Cleveland Clinic Foundation to immediately produce to me:
  • All audit trail logs and metadata associated with my January 25–26, 2024, care at Marymount and Hillcrest Hospitals,
  • All security access logs related to the editing or viewing of my records,
  • Complete versions of all consent forms, addenda, internal memos, incident reports, and grievance communications related to this episode.
  • Compel the Clinic to amend my medical records, pursuant to 45 C.F.R. § 164.526
  • A correction of falsified timestamps and consent forms,
  • An acknowledgment that the electronic record was altered or is incomplete.

- Issue a declaratory judgment finding that Cleveland Clinic's conduct — including denial of access, refusal to amend, retroactive entries, and EMTALA violations — violated my rights under federal law, Ohio common law, and HIPAA.
- An adverse-inference instruction that any disputed fact concealed or altered by Defendants— including the back-dated consent and nursing addenda—be deemed established in my favor.
- Mandate policy reforms at Marymount Hospital to:
- Prohibit the administration of Cytotec or similar agents in breech or high-risk pregnancies without OB/GYN consultation,
- Require written justification for denial of emergency transfer requests,
- Ensure all emergency departments retain and disclose audit trail logs within 15 days of request,
- Train staff on proper informed consent and patient transfer laws under EMTALA.
- Impose oversight measures for a period of no less than 12 months, including:
  - Random external audits of Marymount's maternal care records,
  - Quarterly compliance reports submitted under oath to the Court regarding consent, documentation integrity, and emergency transfer handling,
  - Formal response tracking for all patient record amendment requests. These steps are necessary not just to vindicate my rights, but to prevent the continuation of a pattern that places other vulnerable patients — particularly Black mothers and their babies — at grave risk of harm. Without this Court's intervention, Cleveland Clinic and its facilities will continue to obscure the truth, mismanage emergencies, and violate patient rights with impunity.

Respectfully submitted,
Dated: September 29, 2025

*Whitnie Jackson*

Pro Se Plaintiff
18015 Chagrin Blvd
Shaker Heights, OH 44122
wwrjackson@gmail.com
(440) 825-7225
Attached: Exhibits A-L

Subscribed and sworn to before me by Whitnie R. Jackson, this 2 day of October 2025.

x *Whitnie Jackson*

Notary Public, State of Ohio
My Commission Expires: 1/14/2026

x *Tajee Glenn*

TAJEE' GLENN
Notary Public
State of Ohio
My Comm. Expires
January 14, 2026

**Attached Exhibit Index – Whitnie Jackson v. Cleveland Clinic Foundation**

(Filed with Complaint in U.S. District Court for the Northern District of Ohio)

**Medical Records & Emergency Care Documentation**

Exhibit A – Emergency Medical Records: Marymount (Jan 25–26, 2024)
Marymount Hospital ER Records (Dr. Nathan Eikhoff notes, triage, observations, MAR – Cytotec, Tylenol, Consent Form with Non-Handwritten Completion \[challenged])

**Internal Complaints, Grievances & Correspondence**

Exhibit B – Formal Complaint to Cleveland Clinic Compliance Department
Exhibit C – Ombudsman Complaint to Cleveland Clinic Office of Patient Experience
Exhibit D – HIPAA Records Requests and Follow-Up Correspondence

**Damages & Psychological Harm**

Exhibit E – Witness Statements: Mother, Father of Child

**Spoliation, Pattern, and Timeline Documentation**

Exhibit F – Cleveland.com Article Cleveland Clinic faces $650,000 fine for Marymount Hospital

Respectfully submitted,

Whitnie R. Jackson,
Pro Se Plaintiff
8015 Chagrin Blvd
Shaker Heights, OH 44122
wwrjackson@gmail.com
(440) 825-7225

## **CERTIFICATE OF SERVICE**

This certifies that the foregoing plaintiff AMENDED COMPLAINT. was filed on October 3, 2025.

Notice of this filing will be sent to all the parties by Email pursuant to Fed. R. Civ. P. 5(b)(2)(E)  to:

Erin S. Hess: EHess@reminger.com

Jessica O. Jackson: JJackson@reminger.com

John/Jane Doe Medical staff defendants
Defendants

_____

Whitnie Jackson
Pro se