UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WHITNIE JACKSON, | ) | CASE NO. 1:25-cv-01227 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CLEVELAND CLINIC FOUNDATION, *et al.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

Before the Court is Defendants' Motion to Strike Plaintiff's Amended Complaint or in the Alternative, Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 40.) Plaintiff opposed the motion (Doc. 45), and Defendants replied (Doc. 48). For the reasons stated herein, the motion to strike is DENIED and the motion to dismiss is GRANTED in part.

## I. BACKGROUND

### A. Complaint Allegations[1]

*Pro se* Plaintiff Whitnie Jackson ("Jackson") brings this action against Defendants Cleveland Clinic Marymount Hospital ("Marymount"), Dr. Nathan Eikhoff ("Dr. Eikhoff"), and John/Jane Doe medical staff (collectively "Defendants"). (Doc. 37 at ¶ 1.) All allegations relate to the stillborn death of her son, Amir Rodgers ("decedent"), on January 26, 2024. (*Id.*)

On January 25, 2024, Jackson went to the emergency room at Marymount. (*Id.*) She was 28 weeks pregnant and experiencing preterm labor. (*Id.*) She arrived around 11:00 p.m. and was

[1] The facts alleged in the amended complaint are summarized here and presumed true for purposes of this motion. *See Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 534 (6th Cir. 2017).

left to wait in the emergency room for hours. (*Id.* at ¶¶ 2, 28.) Her water broke in the waiting area around 3:40 a.m. (*Id.* at ¶¶ 2, 29.) She was told the fetus was in a footling breech position. (*Id.* at ¶ 29.) A nursing note at 3:43 a.m. states Jackson "did not appear in distress." (*Id.* at ¶ 69.) Two minutes after that note by the nurse, her heart rate was 112 bpm with an elevated blood pressure. (*Id.*)

Jackson generally asserts her condition of preterm labor with a footling breech presentation and ruptured membranes was "a known obstetric emergency." (*Id.* at ¶¶ 1, 29.) She also characterizes her condition as a "complicated obstetric condition." (*Id.* at ¶ 29b.) Jackson claims Dr. Eikhoff, the attending physician, and Marymount staff recognized she was experiencing an obstetric emergency. (*Id.* at ¶¶ 2, 29a.)

Jackson's condition required immediate consultation with an obstetrician and transfer to a Level III neonatal intensive care unit per American College of Obstetricians and Gynecologists ("ACOG") and Emergency Medical Treatment and Active Labor Act ("EMTALA") guidelines. (*Id.* at ¶ 29.) Marymount is not a Level III neonatal intensive care unit, so it lacked the capability to effectively screen or stabilize a 28-week neonate. (*Id.* at ¶ 30.) Marymount staff failed to follow standards and hospital policy for obstetric emergencies by failing to provide immediate obstetric consultation and continuous fetal monitoring or timely transfer to a facility with higher-level care. (*Id.* at ¶ 29.)

After Jackson's water broke, she was not provided with an adequate medical screening examination ("MSE") as required under EMTALA. (*Id.* at ¶¶ 2, 55.) There was no obstetrician on site or an individual qualified to perform the initial MSE. (*Id.* at ¶¶ 2, 31.) Instead, Dr. Eikhoff "limited his evaluation to a brief bedside ultrasound/doppler that failed to capture fetal heart tones[.]" (*Id.* at ¶¶ 2, 55.) Dr. Eikhoff told her the baby's position would not allow him to

perform an assessment with the equipment he had. (*Id.* at ¶ 2.) Dr. Eikhoff's evaluation failed to capture fetal "biometry, presentation, or viability." (*Id.* at ¶ 55.) No digital cervical exam, ultrasound confirmation of presentation, continuous fetal monitoring, laboratory work-up, or consultation with the on-call obstetrician was performed or documented. (*Id.* at ¶¶ 35, 55.)

The screening Jackson received deviated from Marymount's obstetric protocol. (*Id.* at ¶ 55.) "By denying [her] a comprehensive MSE reasonably calculated to identify an obstetric emergency," Marymount exposed her and her fetus to "unmanaged and foreseeable peril" in violation of EMTALA's screening requirements. (*Id.* at ¶ 55.) The medical record falsely suggests sufficient screening was performed, "contradicting Dr. Eikhoff's own admission that he was unable to determine fetal heart tones or confirm viability likely because he was not adequately trained or qualified in obstetric emergencies." (*Id.* at ¶ 55.)

Despite the hospital's lack of obstetric and neonatal intensive care capabilities, the medical staff proceeded with labor induction without appropriate consultation or transfer to a facility equipped to handle high-risk deliveries. (*Id.* at ¶ 1.) "[S]taff express[ed] confusion about next steps and noted the absence of OB guidance." (*Id.* at ¶ 40.) Several nurses told Jackson this was their "first delivery" and "were visibly excited rather than prepared." (*Id.* at ¶ 102.) Dr. Eikhoff failed to assess cervical dilation adequately but still proceeded with labor. (*Id.* at ¶ 3.) No obstetrician was physically present after staff told Jackson to begin pushing. (*Id.* at ¶ 31.) After pushing for over an hour, the baby's head became entrapped. (*Id.* at ¶ 2.) Dr. Eikhoff continued with induction medication using Cytotec (misoprostol). (*Id.* at ¶¶ 2, 32.) "An unidentified OB, contacted only by telephone" ordered Cytotec. (*Id.* at ¶ 56.) Cytotec is contraindicated in such scenarios without obstetric consultation, full cervical evaluation, or

surgical backup. (*Id.* at ¶¶ 2, 32.) Fetal heart tones were not confirmed prior to Cytotec administration. (*Id.* at ¶ 33.)

ACOG recommends against vaginal delivery for a footling breech presentation with preterm labor due to the high risk of complications. (*Id.* at ¶ 6.) Instead, ACOG recommends cesarean delivery to minimize risks. (*Id.*) The decision to proceed with Jackson's labor induction without obstetric consultation or surgical backup deviated from established standards. (*Id.*) Jackson asserts expert medical testimony will confirm the failure to consult with an obstetrician and transfer to an appropriate facility deviates from accepted emergency obstetric protocols. (*Id.* at ¶ 7.)

No one intervened when Dr. Eikhoff deviated from obstetric protocol and the staff's "inexperience and failure to escalate care show a systemic lack of training and supervision." (*Id.* at ¶ 102.) Jackson's fetus died in front of her, still partially entrapped, while staff congratulated themselves on delivering their first baby. (*Id.* at ¶¶ 81, 84.) Had competent staff been hired and properly trained, her fetus would have received competent care. (*Id.* at ¶ 105.) These failures were a foreseeable and proximate cause of her fetus' stillbirth. (*Id.*)

The conduct of Marymount and its staff failed to adhere to established medical standards. (*Id.* at ¶ 9.) Dr. Eikhoff and the nursing staff specifically breached their duty of care by failing to perform a cervical digital exam before directing her to push; ignoring the need for immediate obstetric consultation and surgical backup for a footling breach; administering Cytotec despite guidelines contraindicating induction agents in active breech labor; and pulling on the fetus' legs without an operating team on standby resulting in head entrapment and irreversible hypoxia. (*Id.* at ¶ 59.) "These departures from the standard of care were the proximate cause of my son's death and my own physical and emotional injuries." (*Id.* at ¶ 60.) Cleveland Clinic knew, or

should have known, its emergency triage and obstetric protocols were dangerously deficient. (*Id.* at ¶ 63.)

"As a Black uninsured woman, [Jackson] was subjected to substandard care due to implicit bias and systemic disparities known to exist in emergency maternal health settings." (*Id.* at ¶ 12.) She references studies establishing racial disparities in maternal health outcomes and claims these disparities were evident in her treatment. (*Id.*) Jackson also references an instance from 2015 where federal regulators cited the Cleveland Clinic for patient safety violations due to record keeping and procedural deficiencies. (*Id.* at ¶¶ 10, 54.) "On information and belief," Cleveland Clinic has a practice of deprioritizing maternal and fetal emergencies involving Black women and Medicaid patients. (*Id.* at ¶ 101.)

After Dr. Eikhoff identified a footling breech presentation with ruptured membranes, EMTALA required Marymount to provide stabilizing treatment within its capabilities or arrange appropriate transfer. (*Id.* at ¶ 56.) Instead, staff proceeded with labor. (*Id.* at ¶ 56.) This conduct destabilized the situation and led to the deterioration of Jackson's and her fetus' condition. (*Id.* at ¶ 56.) Despite Marymount's lack of on-site obstetric and neonatal intensive care support, staff failed to stabilize her or her fetus before continuing active delivery. (*Id.* at ¶ 56.) Jackson was not transferred until later. (*Id.* at ¶ 56.) "Hillcrest Hospital's subsequent documentation of 'fetal demise prior to arrival' underscores Marymount's mismanagement during the critical window of care[.]" (*Id.* at ¶ 60.)

Defendants failed to comply with EMTALA and Ohio law by refusing to "transfer [Jackson] to a higher-level facility despite [her] preterm status and complicated presentation." (*Id.* at ¶ 57.) She asked to be transferred to University Hospitals, but Dr. Eikhoff denied her request. (*Id.* at ¶¶ 3, 29b.) He told her there was no available ambulance. (*Id.* at ¶ 3.) There is

no documentation that a qualified obstetrician determined transfer was unsafe or there was inadequate time to transfer prior to delivery. (*Id.* at ¶ 57.) Marymount also failed to document any call to emergency medical services or to University Hospitals. (*Id.* at ¶ 58.) Marymount staff falsely represented to Jackson no ambulance was available, an obstetrician was monitoring her case, and she was being placed on continuous fetal monitoring. (*Id.* at ¶ 89.) In reliance on those assurances, she remained at Marymount instead of arranging her own transfer to University Hospitals. (*Id.* at ¶ 89.) Jackson's chart was backdated to indicate she refused transfer. (*Id.* at ¶ 90.) She was eventually transferred to Hillcrest Hospital. (*Id.* at ¶¶ 56, 60.)

**B. Procedural Background**

On June 11, 2025, Jackson filed the initial complaint. (Doc. 1.) She alleged fourteen claims: violations of EMTALA, 42 U.S.C. § 1395dd (Counts One-Three); a denial of due process under 42 U.S.C. § 1983 (Count Seven); a wrongful death claim under Ohio Revised Code § 2125.01 (Count Five); and Ohio common law claims for medical negligence/malpractice, spoliation of evidence, negligent infliction of emotional distress, intentional infliction of emotional distress, fraudulent misrepresentation and concealment, breach of fiduciary duty/special relationship, civil conspiracy, negligent supervision and training, and negligent retention and credentialing (Count Four, Six, Eight-Fourteen). (*Id.* at 9-22.)[2]

In response, Defendants moved for judgment on the pleadings. (Doc. 17.) On August 22, 2025, Jackson moved for leave to amend the complaint and/or substitute parties. (Doc. 21.) In her motion, Jackson referenced that Defendants raised a standing issue regarding the wrongful death claim and her ability to represent the decedent's estate *pro se*. (*Id.* at 239.)

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

On September 24, 2025, the Court granted Jackson's motion for leave to amend and denied the motion for judgment on the pleadings as moot. (9/24/2025 Non-Document Order.) The Court ordered: "Plaintiff has until 10/3/2025 to file an amended complaint and/or substitute parties." (*Id.*)

Jackson timely filed her amended complaint. (Doc. 37.) The amended complaint substituted parties, but it also removed some causes of action and added others. (*Compare* Doc. 1, *with* Doc. 37.) In addition to Jackson's EMTALA claims (Counts One-Three), her amended complaint brings claims for wrongful death and survivorship of the decedent as Representative of the Estate of Amir Rodgers under Ohio Revised Code § 2125.01 (Count Five). (Doc. 37 at ¶¶ 8, 64-66.) She also brings Ohio common law claims for medical negligence/malpractice, spoliation of evidence, negligent and intention infliction of emotional distress, fraudulent misrepresentation and concealment, breach of fiduciary duty, civil conspiracy, negligent supervision and training, and battery (Counts Four, Six-Thirteen). (*Id.* at ¶¶ 59-63, 67-113.)

On October 9, 2025, Defendants moved to strike the amended complaint for exceeding the Court's order granting leave to amend, or in the alternative, to dismiss the amended complaint. (Doc. 40.) The motion is fully briefed.[3] (Docs. 45, 48.)

---

[3] Defendants also moved for a protective order, or alternatively, to stay discovery pending a ruling on the motion to strike/motion to dismiss. (Doc. 41.) Defendants asserted Jackson, a *pro se* plaintiff, had no standing to represent the decedent's estate. (*Id.*) Magistrate Judge Greenberg granted the motion for a protective order or motion to stay discovery in part. (*See* Doc. 58.) Discovery was stayed and an evidentiary hearing was set on the estate representation issue. (*Id.* at 583.) While Magistrate Judge Greenberg issued a Report and Recommendation ("R&R") on the estate representation issue after the hearing (Doc. 70), in light of the fact that the Court declines to exercise supplemental jurisdiction over Jackson's state-law claims, the Court need not address the R&R and related filings.

## II. MOTION TO STRIKE AMENDED COMPLAINT OR IN THE ALTERNATIVE, MOTION TO DISMISS AMENDED COMPLAINT

### A. Motion to Strike

"The Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The decision to strike an affirmative defense is discretionary. *Operating Eng'rs Local 325 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing *Dassault Systemes, SA v. Childress*, 663 F.3d 832, 846 (6th Cir. 2011)). But "[m]otions to strike are viewed with disfavor and are not frequently granted." *Id.* (citations omitted).

Leave to file an amended complaint should be "freely" given "when justice so requires." FED. R. CIV. P. 15(a)(2). Courts have stricken amendments pursuant to Rule 12(f) that exceed the scope of leave granted. *See In re Keithley Instruments, Inc.*, 599 F. Supp. 2d 908, 911-16 (N.D. Ohio 2009); *Patterson v. HG Ohio Emp. Holding Corp.*, No. 23-cv-681, 2024 U.S. Dist. LEXIS 82557, 2024 WL 2022088, at *2-3 (N.D. Ohio May 7, 2024) (collecting cases).

Defendants move to strike Jackson's amended complaint as exceeding the Court's order granting leave to amend. (Doc. 40 at 384-86, 388-89.) To Defendants, Jackson moved to amend her complaint only to substitute parties to overcome standing issues for her wrongful death claim. (*Id.*; Doc. 21 at 239.) Although her motion for leave to amend states the claims would not change, her amended complaint added additional claims for battery, lack of informed consent, and negligence per se, removed her § 1983 and negligent retention claims, changed original allegations in places, and added new allegations. (Doc. 40 at 385-86 (citing Doc. 37 at ¶¶ 1, 19, 20, 27, 29, 30, 41, 57, 61, 66, 67, 73, 81, 107-113).) Jackson's amended complaint exceeded the Court's Order granting leave to amend because she did more than substitute parties, Defendants urge. (Doc. 40 at 386, 388-89.)

But the Court's Order was not as limited as Defendants suggest. Jackson was given leave "to file an amended complaint and/or substitute parties." (9/24/2025 Non-Document Order.) The amended complaint does not exceed the scope of the Cour's Order. The motion to strike is denied and the Court will assess the alternative arguments presented in the motion to dismiss.

**B. Motion to Dismiss**

Under Rule 12(b)(6), a court must dismiss a complaint if it fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a Rule 12(b)(6) motion, the complaint must make out a plausible legal claim, meaning the complaint's factual allegations must be sufficient for a court "to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Plausibility does not require any specific probability of success, but it does demand "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When evaluating a motion to dismiss, the Court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 534 (6th Cir. 2017) (quoting *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016)). But the court "'need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275-76 (6th Cir. 2010)). A pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 246-47 (6th Cir.

2012)). Nor does a complaint suffice if it "tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (quotations and citations omitted).

*Pro se* pleadings are liberally construed. *Boag v. MacDougall*, 454 U.S. 364, 365, 102 S. Ct. 700, 70 L. Ed. 2d 557 (1982) (per curiam); *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996); *Garrett v. Belmont Cnty. Sheriff's Dep't*, 374 F. App'x 612, 614 (6th Cir. 2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)). "However, this lenient treatment has limits . . . ." *Pilgrim*, 92 F.3d at 416 (citation omitted). Liberal construction for *pro se* litigants does not "abrogate basic pleading essentials." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).

A plaintiff may plead herself out of federal court if the allegations presented demonstrate a bar to relief. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("sometimes the allegations in the complaint affirmatively show that the claim" is deficient or disallowed as a matter of law); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) ("A complaint will be dismissed pursuant to Rule 12(b)(6) if no law supports the claim made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief.") (citing *Twombly*, 550 U.S. at 561-64); *see also O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.").

A plaintiff, including a *pro se* plaintiff, who fails to respond to a motion to dismiss a claim is deemed to have abandoned the claim. *See Humphrey v. United States AG Office*, 279 F. App'x 328, 331 (6th Cir. 2008) ("where . . . [a] plaintiff has not raised arguments in the district

court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived"); *Scott v. Tennessee*, 878 F.2d 382 (unpublished table decision) (6th Cir. 1989) ("if a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion"); *Weatherby v. Fed. Express*, 454 F. App'x 480, 490 (6th Cir. 2012) ("[t]hough this court provides some leeway to *pro se* litigants, Plaintiff must still make some effort at argumentation or presentation of facts" and absent such effort, Plaintiff's claims are waived); *see also Bryant v. McDonough*, No. 20-cv-726, 2021 U.S. Dist. LEXIS 221273, 2021 WL 5359182, at *9 (N.D. Ohio Nov. 17, 2021), *aff'd*, 72 F.4th 149 (6th Cir. 2023) (dismissing *pro se* plaintiff's claim on motion to dismiss where she failed to address the defendant's arguments in opposition), *abrogated on other grounds by Kellar v. Yunion, Inc.*, 157 F.4th 855 (6th Cir. 2025); *Viola v. Ohio AG*, No. 20-cv-765, 2021 U.S. Dist. LEXIS 26701, 2021 WL 510746, at *23 (N.D. Ohio Feb. 11, 2021) (same).

### 1. EMTALA Claims

EMTALA was enacted after "highly publicized incidents where hospital emergency rooms allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient." *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). "Congress intended this legislation to prevent hospitals from dumping patients who suffered from an emergency medical condition because they lacked insurance to pay the medical bills." *Est. of Lacko v. Mercy Hosp., Cadillac*, 829 F. Supp. 2d 543, 548 (E.D. Mich. 2011) (citing *Cleland*, 917 F.2d at 268; *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990)). The statute was not intended to establish standards for patient care, provide a suit for medical negligence, or substitute for a medical

malpractice claim. *Moses v. Providence Hosp. and Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009).

Defendants argue Jackson's EMTALA claims should be dismissed for failure to state a claim. (Doc. 40 at 387, 398-402.) In response, Jackson simply states "Defendants' assertions of immunity under the PREP Act and Ohio tort reform statutes do not bar my federal EMTALA claims[.]" (Doc. 45 at 439.) On reply, Defendants note they did not raise an immunity defense and assert Jackson failed to provide any relevant argument opposing dismissal of her EMTALA claims. (Doc. 48 at 496-97.)

Notwithstanding Jackson's abandonment of her EMTALA claims for failing to respond to the challenges raised in Defendants' motion to dismiss, the three claims fail on the merits.

**a. Screening**

Under 42 U.S.C. § 1395dd(a):

> In the case of a hospital that has a hospital emergency department, if any individual comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

In *Cleland v. Bronson Health Care Grp.*, the Sixth Circuit "interpret[ed] the vague phrase 'appropriate medical screening' to mean a screening that the hospital would have offered to any paying patient, and the vague phrase "emergency medical condition" to mean a condition within the actual knowledge of the doctors on duty or those doctors that would have been provided to any paying patient." 917 F.2d at 268-69. The *Cleland* court rejected the plaintiffs' argument that the term "appropriate medical screening" "denote[d]…the full panoply of state malpractice law." *Id.* at 271.

[W]hether a hospital administered an "appropriate" screening refers not only to the hospital's standards, but also to the motives with which a hospital acts." *Est. of Lacko*, 829 F. Supp. 2d at 549 (citing *Cleland*, 917 F.2d at 272). "If a hospital acts in the same manner as it would have for the usual patient, then the screening provided is appropriate." *Id.* A plaintiff must provide "evidence of disparate treatment based on improper motive" to succeed on an EMTALA screening claim. *Id.* (citations and quotations omitted); *see also Romine v. St. Joseph Health Sys.*, 541 F. App'x 614, 620 (6th Cir. 2013) ("an EMTALA plaintiff . . . must adduce some evidence that her screening differed in some way from that given to other patients, and the difference was improperly motivated").

Defendants assert Jackson fails to allege she was treated differently than any other patient or that any difference in treatment was precipitated by an improper motive. (Doc. 40 at 399-400.) As to disparate treatment, Jackson alleges Dr. Eikhoff limited his evaluation to a brief bedside ultrasound/doppler that failed to capture fetal heart tones, biometry, presentation, or viability. (Doc. 37 at ¶ 55.) She was not given a formal obstetric ultrasound, continuous fetal monitoring, a pelvic digital exam, or a laboratory work-up. (*Id.*) No obstetrician was summoned despite hospital policy requiring consultation for breech or preterm presentations. (*Id.*) Jackson contends, "[t]his perfunctory screening departed from the hospital's customary obstetric protocol[.]" (*Id.*) "By denying [her] a comprehensive MSE reasonably calculated to identify an obstetric emergency," Marymount violated the EMTALA screening requirement, she urges. (*Id.*) In accepting Jackson's factual allegations as true and drawing all reasonable inferences in her favor, as the Court must, Jackson has plausibly alleged the disparate treatment prong of her screening claim. *See Est. of Lacko*, 829 F. Supp. 2d at 550.

As to improper motive, Jackson alleges "[a]s a Black uninsured woman, [she] was subjected to substandard care due to implicit bias and systemic disparities known to exist in emergency maternal health settings." (Doc. 37 at ¶ 12.) She generally references studies establishing racial disparities in maternal health outcomes and claims these disparities were evident in her treatment. (*Id.*) Jackson also references an instance from 2015 where federal regulators cited the Cleveland Clinic for patient safety violations due to record keeping and procedural deficiencies. (*Id.* at ¶¶ 10, 54.) She further asserts, "[o]n information and belief," Cleveland Clinic has a practice of deprioritizing maternal and fetal emergencies involving Black women and Medicaid patients. (*Id.* at ¶ 101.)

Here, although Jackson references her status as a Black and uninsured woman, she fails to allege facts supporting that her race or insurance motivated Marymount's conduct. *See Est. of Lacko*, 829 F. Supp. 2d at 550-51 (dismissing screening claim where despite alleging plaintiff was on Medicaid, plaintiff alleged no facts to support his treatment would have been different had he not been on Medicaid); *see also Broughton v. St. John Health Sys.*, 246 F. Supp. 2d 764, 769 (E.D. Mich. 2003) (dismissing screening claim where plaintiff failed to allege hospital's failure to conduct tests was due to an impermissible motive); *Elmhirst v. McLaren N. Mich.*, No. 17-cv-374, 2017 U.S. Dist. LEXIS 112431, 2017 WL 4535714, at *4 (W.D. Mich. July 19, 2017) (dismissing screening claim where plaintiff "formulaically allege[d]" hospital acted based on her lack of insurance without any support facts that staff knew about her lack of insurance), *aff'd*, 726 F. App'x 439 (6th Cir. 2018), *cert. denied*, 586 U.S. 919, 139 S. Ct. 325, 202 L. Ed. 2d 221 (2018); *Huber v. Mia. Valley Hosp., Inc.*, No. 20-cv-294, 2022 U.S. Dist. LEXIS 176980, 2022 WL 4540180, at *4 (S.D. Ohio Sept. 28, 2022) (dismissing screening claim for failure to

allege improper motive where plaintiff failed to allege facts she was treated based on appearance of inability to pay for services).

Other than Jackson's general references to a difference in maternal health outcomes involving Black and Medicaid patients, "[t]here is nothing to suggest that anyone at Defendant's hospital took that information into consideration or, because of that information, altered or failed to administer any tests, procedures, or diagnoses that would have otherwise been made or done." *Est. of Lacko*, 829 F. Supp. 2d at 551. Even in viewing the amended complaint in a light most favorable to Jackson, she does not allege facts to establish Dr. Eikhoff or anyone at Marymount was aware of Jackson's lack of insurance or financial status or took her race into consideration. Instead, she alleges Dr. Eikhoff "was not adequately trained or qualified in obstetric emergencies" and Marymount "lacked the capability to effectively screen" her. (Doc. 37 at ¶¶ 30, 55.) Jackson's allegations are not enough where "the facts do not permit the Court to infer more than a possibility that there was an improper motive." *Est. of Lacko*, 829 F. Supp. 2d at 551 (citing *Iqbal*, 556 U.S. at 678). Jackson fails to state an improper screening claim in Count 1.

#### b. Stabilization

Under 42 U.S.C. § 1395dd(b),

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

For a hospital to be liable for failure to stabilize a patient, the hospital must (1) "determine[] that the individual has an emergency medical condition" and (2) the hospital must

have failed to stabilize the patient before transferring or discharging the patient. *See Cleland*, 917 F.2d at 268; *Est. of Lacko*, 829 F. Supp. 2d at 552.

"[T]o trigger further EMTALA obligations, the hospital physicians must actually recognize that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 585 (6th Cir. 2009) (citing *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir. 2003)). "Only actual knowledge of an emergency medical condition [by Defendant]—not simply the existence of facts that should have put Defendant on notice—triggers a duty to stabilize a patient pursuant to § 1395dd(b) of EMTALA." *Burd v. Lebanon HMA, Inc.*, 756 F. Supp. 2d 896, 906 (M.D. Tenn. 2010). In *Estate of Lacko*, the Court noted negligence claims alleging a hospital failed to detect an emergency condition and claims requiring actual knowledge, such as EMTALA stabilization claims, are not compatible. 829 F. Supp. 2d at 553.

Defendants argue Jackson fails to allege Marymount had actual knowledge of her emergency medical condition. (Doc. 40 at 401.) In her screening claim, she alleges she was denied "a comprehensive MSE reasonably calculated to identify an obstetric emergency. (*Id.* (citing Doc. 37 at ¶ 55).) Jackson's claim that Marymount's employees would have known about her emergency medical condition had they provided a better screening is incompatible with EMTALA's actual knowledge requirement, Defendants urge. (*Id.*) Defendants maintain Jackson's amended complaint concedes actual knowledge was lacking and there are no facts to plausibly allege Dr. Eikhoff had actual knowledge of her condition. (*Id.* at 401-02.)

Jackson claims Dr. Eikhoff and Marymount staff recognized she was experiencing an obstetric emergency. (*Id.* at ¶ 29a.) The Court must consider whether Jackson has plausibly alleged facts to support this conclusion. *See Iqbal*, 556 U.S. at 678.

Jackson alleges her condition of preterm labor with a footling breech presentation and ruptured membranes was "a known obstetric emergency." (*Id.* at ¶¶ 1, 29.) Elsewhere she characterizes her condition as a "complicated obstetric condition." (*Id.* at ¶¶ 29b, 57.) She asserts ACOG recommends against vaginal delivery for a footling breech presentation with preterm labor due to the high risk of complications. (*Id.* at ¶ 6.)

Jackson asserts Marymount lacked obstetric and neonatal intensive care capabilities. (*Id.* at ¶ 1.) A nursing note from 3:43 a.m. states Jackson "did not appear in distress" after her water broke. (*Id.* at ¶ 69.) She contends there was no obstetrician on site or an individual qualified to perform the initial MSE. (*Id.* at ¶¶ 2, 31.) Instead, Dr. Eikhoff's perfunctory evaluation failed to confirm fetal heart tones, biometry, presentation, or viability. (*Id.* at ¶¶ 2, 55.) Dr. Eikhoff admitted he was unable to do so "likely because he was not adequately trained or qualified in obstetric emergencies." (*Id.* at ¶ 55.) She also alleges "staff express[ed] confusion about next steps," nurses told her this was their "first delivery," and they "were visibly excited rather than prepared." (*Id.* at ¶¶ 40, 102.) Jackson claims the staff's "inexperience and failure to escalate care show a systemic lack of training and supervision." (*Id.* at ¶ 102.)

She further alleges had competent staff been hired and properly trained, her fetus would have received competent care. (*Id.* at ¶ 105.) These failures were a foreseeable and proximate cause of her fetus' stillbirth, Jackson argues. (*Id.* at ¶ 105.) "By denying [her] a comprehensive MSE reasonably calculated to identify an obstetric emergency," Marymount exposed her and her fetus to "unmanaged and foreseeable peril." (*Id.* at ¶ 55.)

On balance, these allegations cannot be squared with Jackson's conclusory assertion that Dr. Eikhoff and Marymount staff were aware of her emergency condition. *See Elmhirst*, 726 F. App'x 439, 444-45 (6th Cir. 2018) (affirming dismissal of stabilization claim where complaint alleged no facts to plausibly support inference hospital actually knew plaintiff was suffering from an emergency medical condition; plaintiff's core allegation was hospital failed to detect her emergency medical condition), *cert. denied*, 586 U.S. 919, 139 S. Ct. 325, 202 L. Ed. 2d 221 (2018); *Est. of Lacko*, 829 F. Supp. 2d at 552-54 (plaintiff alleged emergency condition existed but fell short of alleging defendant knew of emergency condition where complaint explicitly alleged defendant failed to determine and diagnose emergency condition); *Burd v. Lebanon HMA, Inc.*, 756 F. Supp.2 d 896, 906 (M.D. Tenn. 2010) (because hospital diagnosed the patient with acute anxiety and determined he was stable, it did not have actual knowledge of an emergency medical condition); *Perry v. Owensboro Health, Inc.*, No. 14-CV-00046, 2015 U.S. Dist. LEXIS 93688, 2015 WL 4450900, at *6-8 (W.D. Ky. July 20, 2015) (dismissing stabilization claim where plaintiffs failed to plead factual allegations defendant had actual knowledge of unstable emergency condition when discharged); *Huber*, 2022 WL 4540180, at *5 (S.D. Ohio Sept. 28, 2022) (dismissing stabilization claim where complaint alleged hospital failed to detect plaintiff's emergency medical condition despite her exhibiting symptoms that should have made it aware of the condition).

Although Jackson makes the bare assertion Dr. Eikhoff and Marymount staff knew a footling breech presented an emergency medical condition, there are no supporting facts, even when viewed in a light most favorable to Jackson, that make actual knowledge plausible. Her complaint centers on Dr. Eikhoff's allegedly negligent treatment and that Marymount did not have anyone equipped to handle her treatment. Staff were confused and inadequately trained in

obstetric emergencies. She explicitly alleges she was denied a comprehensive screening "reasonably calculated to identify an obstetric emergency." (Doc. 37 at ¶ 55.) These allegations demonstrate a bar to federal relief. *See Cataldo*, 676 F.3d at 547; *Riverview Health Inst*, 601 F.3d at 512; *Southfield Educ. Ass'n*, 570 F. App'x at 487. She cannot plausibly allege actual knowledge of an emergency condition. Jackson fails to state a stabilization claim in Count 2.

**c. Transfer**

Under 42 U.S.C. § 1395dd(c), "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized . . ., the hospital may not transfer [or discharge] the individual unless . . . [certain conditions have been satisfied]." § 1395dd(c)(1). Accordingly, a "failure-to-transfer theory" is "more accurately characterized as a discharge-before-stabilization theory." *Elmhirst*, 2017 WL 4535714, at *5, *aff'd* 726 F. App'x 439 (6th Cir. 2018), *cert. denied*, 586 U.S. 919 (2018). Like the stabilization requirement in § 1395dd(b), liability for an EMTALA transfer claim is predicated on the hospital's actual knowledge of an emergency medical condition. *Id.* (citing *Cleland*, 917 F.2d at 268); *see also Broughton*, 246 F. Supp. 2d at 772-75.

Defendants argue Jackson's failure to plead sufficient facts establishing actual knowledge of her emergency condition means her EMTALA transfer claim also fails. (Doc. 40 at 402.) The Court agrees. As discussed above, Jackson failed to establish that Marymount had "actual knowledge" of her emergency medical condition. *See Elmhirst*, 2017 WL 4535714, at *5 (dismissing transfer claim where plaintiff failed to plead sufficient facts to establish hospital had actual knowledge of her emergency medical condition); *Broughton*, 246 F. Supp. 2d at 775 (dismissing transfer claim where hospital did not determine plaintiff had an emergency medical condition). Accordingly, she failed to state a transfer claim under EMTALA in Count 3.

In sum, Jackson's EMTALA claims (Counts 1-3) are dismissed for failure to state a claim. Jackson did not request to amend her complaint in response to Defendants' motion to dismiss. (*See* Doc. 45.) Despite her *pro se* status, she is familiar with the procedure for requesting leave to amend, has already amended her EMTALA allegations, and was on notice of the asserted deficiencies with her federal claims. (*See* Docs. 21, 40, 75.) "EMTALA was enacted to prevent hospital emergency rooms from dumping patients that could not afford treatment. It was not intended to provide a suit for medical negligence or substitute for a medical malpractice claim." *Est. of Lacko*, 829 F. Supp. 2d at 555. Here, Jackson's claims sound in medical negligence, and her "allegations do not support a case that EMTALA was intended to cover. Consequently, granting further leave to amend would be futile." *Perry*, 2015 WL 4450900, at *9.

**2. Supplemental Jurisdiction Over State-Law Claims**

Section 1367 provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may decline supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4). Relevant here is § 1367(c)(1)-(3).

Before declining jurisdiction, "a district court should consider and weigh several factors, including the values of judicial economy, convenience, fairness, and comity." *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (citations and quotations omitted); *see also Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993) ("district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues") (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991)). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 867 (6th Cir. 2024). The presumption in favor of dismissal "grows even stronger when the court has dismissed the federal claims on a motion to dismiss." *Cotterman v. City of Cincinnati*, No. 21-3659, 2023 U.S. App. LEXIS 28781, 2023 WL 7132017, at *7 (6th Cir. Oct. 30, 2023) (citing *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996) ("After a 12(b)(6) dismissal, there is a strong presumption in favor of dismissing supplemental claims.")).

Recently, the Sixth Circuit addressed the exercise of supplemental jurisdiction when § 1367(c) applies. *See Williams v. Addison Cmty. Schs.*, 168 F.4th 791 (6th Cir. 2026). There, it reversed the district court's exercise of supplemental jurisdiction because Michigan state courts had not yet spoken to whether a private cause of action exists for claims pursued under the Fair and Just Treatment clause of Michigan's constitution. *Id.* at 796. For this reason, comity mandated dismissal of the state-law claim without prejudice.[4] *Id.*

---

[4] Notably, the opinion cautioned that "district courts should not read this opinion to restrict the broad exercise of supplemental jurisdiction . . . ." *Williams*, 168 F.4th at 796-97.

Because dismissal of Jackson's EMTALA claims (Counts 1-3) is warranted, Defendants assert the Court could decline to exercise supplemental jurisdiction over the remaining state-law claims (Counts 4-13) and dismiss them without prejudice under § 1367(c)(3). (Doc. 48 at 497.) While Jackson asserted supplemental jurisdiction under 28 U.S.C. § 1367, she does not address this position. (*See* Doc. 37 at ¶ 14.)

Defendants raise two issues with Jackson's Ohio statutory wrongful death claim (Count Five) and nine Ohio common law claims (Counts Four, Six-Thirteen): (1) Jackson cannot bring a *pro se* statutory wrongful death claim on behalf of the decedent's estate; and (2) Jackson's Ohio law claims are time-barred under the one-year statute of limitation for medical claims. (*See* Doc. 40 at 387, 390-98; Doc. 48 at 494-96.)

As to the estate representation issue, Defendants argue Jackson cannot represent the decedent's estate *pro se* because there are other statutory next of kin under Ohio Rev. Code § 2125.02(A). (*See* Doc. 40 at 396-98.) Jackson responds she can represent the decedent's estate *pro se* because she is the estate's sole beneficiary and there are no creditors. (*See* Doc. 45 at 437-39.) In other filings, the parties dispute the relevance of the 2023 amendments to Ohio Rev. Code § 2125.02(B) and whether "other next of kin" under the statute were required to preserve their interest in any wrongful death action. (*See* Docs. 71-73, 75-77.)

As to whether the state-law claims are time-barred, Ohio Rev. Code § 2305.113(A) provides a one-year statute of limitations for medical claims. "Medical claims" are defined by § 2305.113(E)(3). Defendants assert the Ohio law claims all medical claims based on medical care Jackson received at Marymount on January 25-26, 2024, and are time-barred. (*See* Doc. 40 at 390-93 (collecting cases); *see also* Doc. 48 at 494-95 (same).) Jackson maintains that due to Defendants' concealment, incomplete record production, and spoliation of evidence, any statute

of limitations is tolled by the discovery rule and equitable tolling under Ohio law. (Doc. 45 at 438; *see also* Doc. 37 at ¶ 19.)

Overall, the § 1367(c) factors favor declining supplemental jurisdiction over Jackson's state-law claims. Jackson's only federal claims (Counts 1-3) are dismissed pursuant to Rule 12(b)(6). *See* 28 U.S.C. § 1367(c)(3). The presumption in favor of dismissal at this stage is strong. *See Cotterman*, 2023 WL 7132017, at *7; *Musson Theatrical, Inc.*, 89 F.3d at 1255. Ten of Jackson's thirteen total claims (Counts 4-13) are based on Ohio law and relate to Defendants' alleged negligence and misconduct. (*See* Doc. 37.) These claims predominate over her three EMTALA claims. *See* 28 U.S.C. § 1367(c)(2). And where discovery has been stayed pending the resolution of the motion to dismiss, the interests of judicial economy, fairness, and the avoidance of multiplicity of litigation are outweighed by the interest against needlessly deciding state-law issues. (*See* Doc. 58 at 583; *see also Landefeld*, 994 F.2d at 1182.)

Further, while not dispositive of the Court's overall analysis, it appears declining supplemental jurisdiction over Jackson's state-law claims is consistent with *Williams* and the interest of comity because she raises novel and complex issues of Ohio law, that being whether her status as the sole beneficiary of the decedent's estate under the Ohio wrongful death statute allows here to appear on behalf of the estate despite her *pro se* status. *See* 168 F.4th at 796; *see also* 28 U.S.C. § 1367(c)(1). It does not appear that Ohio courts have addressed the issue of when a *pro se* plaintiff is the sole beneficiary for a wrongful death action post-amendment of the applicable Ohio statue. And whether Jackson's state-law claims are all medical claims under § 2305.113 and the related limitations period raise other complex and novel issues under Ohio law. *See, e.g.*, *Everhart v. Coshocton Cnty. Mem'l Hosp.*, 176 Ohio St. 3d 91, 247 N.E.3d 101, 109 (2023) ("[the Ohio Supreme Court] court has never considered whether that statute of

limitations [for medical claims in § 2305.113(A)] applies to wrongful-death claims based on medical care"). The Court therefore declines to exercise supplemental jurisdiction over Jackson's state-law claims.[5] Counts 4 through 13 are dismissed without prejudice.

## III. CONCLUSION

For the reasons stated herein, Defendants' Motion to Strike Plaintiff's Amended Complaint (Doc. 40) is DENIED. Defendants' alternative Motion to Dismiss Plaintiff's Amended Complaint (Doc. 40) is GRANTED in part. Counts One through Three are DISMISSED. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, which are DISMISSED without prejudice. Accordingly, all pending motions are DENIED as moot.

**IT IS SO ORDERED.**

**Date:** August 20, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

[5] The Court does not reach the merits of Defendants' arguments regarding dismissal of the state-law claims.